IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT JUSTICE, | ) | CASE NO. 1:13-cv-00836 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Robert Justice ("Plaintiff" or "Justice") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 13.  As explained more fully below, the Administrative Law

Judge ("ALJ") failed to fully and fairly develop the record with respect to evidence that Justice

claimed provided support for his treating physician's opinion and the Court is therefore unable to

determine whether the ALJ's reasons for providing very little weight to that opinion are

supported by substantial evidence and constitute "good reasons."  Accordingly, for the reasons

set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for

further proceedings consistent with this Opinion.

## I.  Procedural History

**A.     Current application**

On June 4, 2009, Justice filed the application for SSI ("SSI") that is at issue in this case.

Tr. 15, 81-84.  He alleged a disability onset date of July 14, 1999. Tr. 81.  He alleged disability

based on back problems, epicondylitis, depression, removal of a testicle, heart problems, anxiety, and a hernia. Tr. 64, 67, 112. After initial denial by the state agency (Tr. 64-66), and denial upon reconsideration (Tr. 67-69), Justice requested a hearing (Tr. 70). On February 3, 2012, Administrative Law Judge John Allen ("ALJ" or "ALJ Allen") conducted an administrative hearing (Tr. 368-399) and, on April 20, 2012, the ALJ conducted a supplemental administrative hearing (Tr. 400-410.)

In his May 3, 2012, decision (Tr. 12-30), the ALJ determined that Justice had not been under a disability since June 4, 2009, the date the application was filed. Tr. 19. The ALJ found that there was new evidence to support his decision not to adopt the findings of the prior Administrative Law Judge Denise McDuffie Martin ("ALJ Martin") (discussed below). Tr. 27. For example, the ALJ stated in part,

> As such, the undersigned finds new evidence that supports finding that the foot elevation requirement is no longer supported by the record. Given this change and the changed constellation of severe impairments that the claimant now suffers from, the undersigned has not adopted the last Administrative Law Judge's finding and instead has crafted a new residual functional capacity that is more consistent with the new evidence.

Tr. 27.

Justice requested review of the ALJ's decision by the Appeals Council. Tr. 10-11. On February 19, 2012, the Appeals Council denied Justice's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 5-7.

## B. Prior applications

Justice previously filed applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits on June 21, 2004. Tr. 18, 51. He alleged a disability onset date of July 14, 1999. Tr. 51. On March 22, 2008, Administrative Law Judge Denise McDuffie Martin ("ALJ Martin") issued a decision finding that Justice had not been under a disability from

July 14, 1999, through the date of the decision.[1]  Tr. 18, 51, 141.   ALJ Martin found that Justice had the following severe impairments: status post removal of the left testicle with groin pain/neuralgia, left shoulder impingement and low back pain.  Tr. 53.  ALJ Martin found that, although Justice had alleged that he was depressed, the evidence failed to show that depression was a severe impairment.  Tr. 53.  ALJ Martin found that Justice had the following Residual Functional Capacity ("RFC"): he could perform sedentary work except he should never reach overhead with his left upper extremity and never climb ladders, ropes, or scaffolds; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; he should be allowed to elevate his legs to foot stool level; and he would only have the mental RFC to understand, remember, and carry out unskilled, simple, repetitive routine tasks due to his complaints of decreased attention and concentration due to his pain.  Tr. 56.

## II. Evidence

### A. Personal, educational and vocational evidence

Justice was born in 1969.  Tr. 81.   He was 42 years old at the time of the first hearing and resided with his wife.  Tr. 373.  He has two children.  Tr. 271.  He received his GED in 1988.  Tr. 118, 272, 374.  He last worked in a factory as a general laborer.  Tr. 112-113, 272.  He stopped working in 1999 after being hurt on the job.  Tr. 112.

### B. Medical evidence[2]

#### 1. Treating physician's opinion

---

[1] ALJ Martin's decision is not dated.   Tr. 48-61. ALJ Allen indicates that ALJ Martin's decision was rendered on March 22, 2008.  Tr. 18.  In his brief, Justice indicates that ALJ Martin denied his June 21, 2004, applications on February 20, 2008.  Doc. 15, p. 2 (citing Tr. 18, 46-61).

[2] Justice has a variety of impairments.  His complete medical history is not summarized herein.  Only the medical evidence pertinent to the Court's analysis is summarized.

In January 2012, Justice's treating physician Siraj Siddiqui, M.D., completed a "Medical Source Statement: Patient's Physical Capacity" ("Physical MSS") (Tr. 348-349) and a "Medical Source Statement: Patient's Mental Capacity" ("Mental MSS") (Tr. 350-351).

In the Physical MSS, Dr. Siddiqui opined that Justice was limited to occasionally lifting and/or carrying 5-10 pounds; he was limited to standing and/or walking 1-2 hours in an 8-hour workday and standing and/or walking for 45 minutes without interruption; he was limited to sitting 1-2 hours in an 8-hour workday; he could occasionally balance; he could rarely or never climb, stoop, crouch, kneel or crawl; he could occasionally reach, handle or feel; he could rarely push and/or pull or perform fine or gross manipulation; and he had environmental restrictions, including  no heights, moving machinery, temperature extremes, chemicals, dust, noise or fumes. Tr. 348-349.  Dr. Siddiqui opined that the foregoing limitations were supported by the fact that Justice was status post CVA.[3]  Tr. 348-349.  He also opined that Justice would require breaks in addition to a morning, lunch and afternoon break.  Tr. 349.  Dr. Siddiqui indicated that Justice had been prescribed a cane, a walker, a TENS unit and a breathing machine.  Tr. 349.  He opined that Justice would require an at-will sit/stand option.  Tr. 349.  He categorized Justice's pain as severe.  Tr. 349.

In the Mental MSS, Dr. Siddiqui rated Justice's ability to perform certain basic mental activities on a sustained basis as either "unlimited/very good," "good," "fair," and "poor or none."  Tr. 350-351.  Dr. Siddiqui opined that Justice's ability to follow work rules was good; Justice's ability to use judgment; understand, remember and carry out complex job instructions;

---

[3] Dr. Siddiqui noted status post CVA for each category of limitations except standing and/or walking.  Tr.  348-349. With respect to Justice's ability to lift and/or carry, Dr. Siddiqui noted status post CVA with left hemiparesis.  Tr. 348.  "CVA" is a "cerebrovascular accident."  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 459.  In their briefs, the parties appear to refer to or use the terms CVA and stroke interchangeably.  Doc. 15, p. 13Doc. 16, p. 2, 9.

maintain appearance; relate predictably in social situations; and manage funds/schedules was fair; and Justice had poor or no ability to maintain attention and concentration for extended periods of 2 hour segments; respond appropriately to changes in routine work setting; maintain regular attendance and be punctual within customary tolerances; deal with the public; relate to co-workers; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stresses; complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out detailed, but not complex job instructions; understand, remember and carry out simple job instructions; socialize; behave in an emotionally stable manner; and leave home on his own.  Tr. 350-351.

### 2. Medical evidence that Justice claims the ALJ ignored or failed to fully and fairly develop

Justice claims that the ALJ ignored the results of a February 14, 2012, MRI ("MRI report") performed on his brain. Doc. 15-1, p. 2.  The MRI report noted that Justice had a clinical history of ataxia and slurred speech, left arm numbness and facial droop.  Doc. 15-1, p. 2.  The MRI impression was:

1. Signal abnormalities described in the bifrontal subcortical white matter are typically seen as sequela from microangipathic ischemic disease or demyelinating/dysmyelinating processes.

2. Boderline Chiari I malformation.

3. Otherwise unremarkable MRI of the brain without and with gadolinium.

Doc. 15-1, p. 2.

During the April 20, 2012, hearing, Justice's counsel argued that results of the MRI report  showing ischemic vessel disease or early onset of a dymelinating condition were

consistent with Justice's reports that he had made since August of the prior year of losing balance and his treating doctor's report of being status post CVA.  Tr. 401.  The MRI report is not contained in the administrative record but Justice submitted the MRI report with his brief in this case[4] and, Justice asserts that those records were submitted by his counsel prior to the hearing on April 17, 2012.  Doc. 15, p. 14, n.5   Doc. 15-1, pp. 2-3.   The Commissioner does not challenge Justice's claim that he submitted the MRI results prior to the hearing.

As discussed more fully below, Justice seeks a sentence six remand for consideration of the MRI report and/or a remand for the reason that the ALJ failed to fully and fairly develop the record by inquiring further about the medical evidence that Justice relied upon to show support for his doctor's opinion.

## C.    Administrative hearings

The ALJ held two administrative hearings.  The first occurred on February 3, 2012 (Tr. 368-399), and the second occurred on April 20, 2012 (Tr. 400-410).[5]  Justice testified at both hearings.  Tr. 373-390, 401-405.  A medical expert testified at the first hearing.  Tr. 390-393.  Vocational experts testified at both hearings.[6]  Tr. 393-396, 405-410.

### 1.    Plaintiff's testimony

During the first hearing, Justice described an incident that occurred in December 2011 that resulted in a diagnosis of Bell's Palsy at the emergency room.  Tr. 374-377.  He was with a friend and was eating a cracker.  Tr. 375.   All of a sudden, he started having chest pain and

---

[4] In addition to the February 14, 2012, MRI results, the records that Justice asserts were submitted on April 17, 2012, include EEG test results and blood test results.  Doc. 15-1, pp. 4-6.

[5] During the first hearing, the ALJ noted that, because there were some medical records missing from the file, he would leave the hearing open for a period of time and possibly hold a supplemental hearing.  Tr. 371-372, 396.

[6] Vocational expert Richard Oestreich  ("VE Oestreich") testified at the February 3, 2012, hearing.  Tr. 393-396. Vocational expert George W. Coleman, III, ("VE Coleman") testified at the April 20, 2012, hearing.  Tr. 405-410.

tingling in his left arm and left leg.  Tr. 375.  He had had chest pains in the past.  Tr. 375.  Thus, at first, he did not think much about the pain but food and water started coming out of the side of his mouth.  Tr. 375.  His friend took him home and he took a nitro pill and some aspirin and slept for 8-12 hours.  Tr. 375.  The following day, he went to the emergency room and he was diagnosed with Bell's Palsy.  Tr. 375-376.  He later went to Mid Ohio Heart.  Tr. 376.  Per Justice, a physician with Mid Ohio Heart indicated that she thought he had been misdiagnosed and she wanted him to follow up with Dr. Hill.  Tr. 376.  Justice reported having seen Dr. Hill the day before the hearing and that Dr. Hill had informed him that he would have to have an MRI done.  Tr. 376-377.

During the second hearing, Justice's counsel argued that there was recent evidence showing that Justice has "either ischemic vessel disease or an early onset of a dymelinating condition that's condition that's consistent with the reports he's made since August of last year of losing balance and his doctor's report of being status post CDA [sic].  We would argue, based on the doctor's RFC's, that he's not able to perform competitive work activity."  Tr. 401.   The ALJ asked Justice about seeing Dr. Hill and Justice reported that he had seen Dr. Hill in March.  Tr. 401-402.  Justice indicated that Dr. Hill had indicated that he was not sure what was happening with him.  Tr. 402-404.  At the close of the hearing, the ALJ stated, "I just have to look at this evidence again, particularly Dr. Siddiqui's notes and found [sic] out where we end up."  Tr. 410.

### 2.     Medical expert's testimony

During the first hearing, the ALJ called James Parker, a board certified neurologist, as a medical expert.  Tr. 390.  The ALJ asked Dr. Parker to confine his opinions to the documentary record or subjective complaints supported by objective evidence rather than solely on Justice's

testimony regarding his conditions.  Tr. 390-391.  Dr. Parker opined that Justice did not have an impairment that met or equaled a Listing.  Tr. 391-392.  Dr. Parker also opined that the only limitation that he felt Justice would have based on his impairments would be related to his left shoulder.  Tr. 392.  More particularly, Dr. Parker opined that Justice would be precluded from overhead reaching and limited to occasional reaching forward and occasional handling.[7]  Tr. 392. Also, Dr. Parker opined that Justice would be limited to lifting 5 pounds frequently and 10 pounds occasionally with his left upper extremity.  Tr. 392-393.

### 3.    Vocational expert's testimony

During the first hearing, the ALJ asked VE Oestreich whether there would be work available either regionally or nationally for someone of Justice's age, education, and with no past work experience who would be limited to sedentary work; could not reach overhead with his left upper extremity; would not be able to use ladders; could occasionally use stairs; could occasionally balance, stoop, kneel, crouch, and crawl; should be permitted, as needed, to elevate his legs to footstool level; and would be limited to the performance of unskilled, simple repetitive tasks.  Tr. 393.  VE Oestreich indicated that, if the individual would be required to elevate his leg to footstool level more than half of the time, the requirement would be considered an accommodation.  Tr. 394.   VE Oestreich indicated that, if the footstool elevation requirement was removed, there would be work available to the described individual, including hand packer, inspector and assembler.[8]  Tr. 394-395.  Although the medical expert opined that Justice would

---

[7] Later in the hearing, the medical expert indicated that he had not provided limitations with respect to handling.  Tr. 395-396.

[8] VE Oestreich indicated that there would be at least 150 of each of the listed jobs available regionally.  Tr. 395.  It is not entirely clear from the hearing transcript how many jobs would be available either statewide or nationally.  Tr. 395.

also be limited to occasional forward reaching, the ALJ did not include such a limitation in the hypothetical. Tr. 395.

During the second hearing, the ALJ asked VE Coleman whether there would be work available either regionally or nationally for someone of Justice's age, and education, and with no past work experience who would be limited to light work; could sit, stand, or walk for 6 hours in an 8-hour day; would be precluded from use of ladders, ropes or scaffolds; would be limited to occasional tasks involving balancing, stooping or crouching; would be precluded from reaching overhead with his left upper extremity; would be precluded from exposure to hazardous machinery or work at unprotected heights; would be limited to the performance of unskilled, simple, repetitive tasks; would be limited to superficial interaction with co-workers and the general public; and should work in a predicted stable environment with minimal changes in routine. Tr. 406-407. VE Coleman indicated that there would be unskilled, light jobs available to the described individual, including mail sorter (170 regionally[9] and 25,530 nationally), assembly worker (80 regionally and 224,240 nationally), and storage facility rental clerk (120 regionally and 414,730 nationally). Tr. 407.

In response to questions from Justice's counsel, the VE indicated that, if the hypothetical individual's interaction with co-workers and the general public was revised to include limitations to both superficial and only occasional, the listed jobs would remain available. Tr. 408-409. The VE also indicated that, if the hypothetical individual was restricted to sedentary work; unskilled, simple, routine tasks; superficial and occasional contact with the general public and co-workers in a predictable and stable environment; and limited to no overhead reaching with the left upper extremity and only occasional use of the left extremity to reach in front of him and for fine or gross manipulation, there would be no work available. Tr. 409-410.

---

[9] VE Coleman indicated that the region he was using was Richland County, Mansfield region. Tr. 407.

The ALJ started to ask VE Coleman a question relating to Dr. Siddiqui's opinion (Exhibit 21F) but then noted that he did not need to ask VE Coleman about that stating, "if I accept, Counsel, if I accept the parameters of Dr. Siddiqui's limitations at 21F, page 3, I'm going to conclude that, that would be work preclusive without the need for vocational testimony."[10] Tr. 408.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a

---

[10] 21F, page 3 is a portion of Dr. Siddiqui's Mental MSS. Tr. 350.

listed impairment,[11] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 19)97).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his May 3, 2012, decision, the ALJ made the following findings:[12]

1.      Acquiescence Rulings 98-3(6) and 98-4(6) apply to Justice's June 2009 Title XVI (SSI) application.[13]  Tr. 17-18.

2.      Justice has not engaged in substantial gainful activity since June 4, 2009, the application date.  Tr. 18.

3.      Justice has the following severe combination of impairments: possible impingement, full thickness tear of rotator cuff and acromioclavicular joint arthrosis of the left shoulder; small disc bulge in the lumbar spine;

---

[11] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

[12] The ALJ's findings are summarized herein.

[13] Acquiescence Rulings 98-3(6) ("AR 98-3") and  98-4(6) ("AR 98-4") relate to when an adjudicator must adopt findings from a prior claim.  *See* AR 98-4, 1998 WL 283902 (June 1, 1998) (discussing application of *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997); *see also* AR 98-3, 1998 WL 283901 (June 1, 1998) (discussing application of *Dennard v. Sec. of Health & Human Services*, 907 F.2d 598 (6th Cir. 1990)).

chronic obstructive pulmonary disease; chest pain; left groin pain status post testicular tumor removal; history of right inguinal hernia and repair; abdominal pain with duodenal ulcers and hiatal hernia; vertigo; mental impairments – anxiety/post-traumatic stress disorder, depression/bipolar disorder, and borderline intellectual functioning.[14] Tr. 18-24.

4.  Justice does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listed impairments. Tr. 25.

5.  Justice has the RFC to perform light work with the following abilities and limitations: (1) able to lift 10 pounds frequently and 20 pounds occasionally; (2) able to sit, stand, and/or walk for 6 hours in an 8-hour workday; (3) precluded from climbing ladders, ropes or scaffolds; (4) limited to occasional tasks involving balancing, stooping, or crouching; (5) precluded from reaching overhead with the left upper extremity; (6) precluded from exposure to hazardous machinery or work at unprotected heights; (7) limited to the performance of unskilled, simple, repetitive tasks; (8) limited to superficial interaction with coworkers and the general public; and (9) should work in a predictable, stable environment with minimal changes in routine. Tr. 26-28.

6.  Justice has no past relevant work. Tr. 28.

7.  Justice was born in 1969, and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 28.

8.  Justice has at least a high school education and is able to communicate in English. Tr. 28.

9.  Transferability of job skills is not an issue because Justice does not have past relevant work. Tr. 28.

10. Considering Justice's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Justice can perform, including mail sorter, assembly worker, and storage facility rental clerk. Tr. 28-29.

---

[14] In reaching his Step Two findings, the ALJ stated in part,

The prior Administrative Law Judge concluded that claimant's "status post removal of the left testicle with groin pain/neuralgia, left shoulder impingement and low back pain" were "severe" and that the claimant's depression was non-severe. The record supports a finding that the claimant now suffers from a different constellation of "severe" impairments.

Tr. 18.

Based on the foregoing, the ALJ determined that Justice had not been under a disability since June 4, 2009, the date the application was filed.  Tr. 29.

## V. Parties' Arguments

### A.    Plaintiff's arguments

Justice requests that the Court remand the case pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of new and material evidence and/or remand the case because the ALJ ignored evidence or failed to fully and fairly develop the record.  Doc. 15, pp. 13-15.  He asserts that, through his counsel, he attempted to submit results of a February 14, 2012, MRI report (Doc. 15, p. 7, n.4, Doc. 15-1, p. 2) prior to the April 20, 2012, administrative hearing; attempted to confirm the ALJ's receipt of that evidence;[15] and discussed that evidence during the hearing (Doc. 15, pp. 13-14).  He argues that results of the MRI report are consistent with his treating physician Dr. Siddiqui's diagnosis of status post CVA but that the ALJ ignored the MRI results and/or failed to fully and fairly develop the record by failing to take steps to obtain the medical evidence referred to by Justice's counsel during the April 20, 2012, hearing.  Doc. 15, pp. 13-15, Doc. 15-1, pp. 2-3.  Justice also asserts that, since the objective MRI test results lend support to his treating physician's opinion, the ALJ's decision to give very little weight to his treating physician's opinion on the basis that there was no objective evidence of a stroke was not supported by substantial evidence.  Doc. 15, pp. 15-18.  Thus, he seeks an order remanding the case for further consideration of the MRI results.  Doc. 15, pp. 13-15.

Justice also claims that the ALJ's RFC finding is not supported by substantial evidence.  Doc. 15, pp. 18-24.  He argues that the ALJ's RFC restricting Justice to a reduced range of light work was inconsistent with the prior ALJ's RFC that restricted Justice to a reduced range of

---

[15] As noted above, the MRI report is not contained in the administrative record but has been attached to Justice's brief.  Doc. 15-1.

sedentary work as well as Dr. Siddiqui's opinion.  Doc. 15, pp. 19-22.  Additionally, Justice argues that the ALJ's RFC finding overlooks left arm restrictions for reaching and handling as identified by the ME during the hearing as well as limitations in the ability to maintain attention and concentration, maintain regular attendance and punctuality, and complete a normal workday and workweek as indicated in Dr. Siddiqui's opinion as well as in the opinions of treating psychiatrist Dr. Pervez and state agency reviewing physicians.  Doc. 15, pp. 22-24.

### B.      Defendant's arguments

In response to Justice's argument that the case should be remanded for consideration of the MRI results, the Commissioner argues that the MRI results are irrelevant because they do not mention a CVA or stroke.  Doc. 16, p. 2, 9.   Also, the Defendant argues that, even if the MRI results related to Justice's alleged stroke, the MRI results do not alone demonstrate functional loss or that his alleged stroke resulted in disability lasting more than 12 months.  Doc. 16, p. 9.

The Commissioner also argues that the ALJ properly gave very little weight to Dr. Siddiqui's opinion that Justice was disabled due to a CVA.  Doc. 16, pp. 9-11.  She argues again that the MRI results do not mention a CVA and that there is no evidence that Justice's physical impairments required extensive treatment such as physical, speech or occupational therapy.  Doc. 16, p. 10.  She also argues that all other objective tests fail to provide support for Justice's claim that he is disabled, i.e., 2007 left heart catheterization, coronary angiography, and left ventriculography did not reveal any "significant obstructive coronary artery disease;" in 2009 treating cardiologist reported there was "no objective evidence of cardiac disease . . . There is no evidence of disability;"  and, in 2011, a CT scan of the brain was normal, a carotid Doppler revealed "no significant stenosis," and a nerve conduction study was within normal limits.  Doc. 16, pp. 10-11 (citing Tr.198, 238, 345, 362, 363, 366).

With respect to Justice's RFC argument, the Commissioner argues that the ALJ found that the record contained new and material evidence and therefore was not required to adopt the prior ALJ's RFC.  Doc. 16, pp. 11-12.  Additionally, the Commissioner argues that the ALJ's RFC is supported by substantial evidence.  Doc. 16, pp. 11-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.     A remand is warranted, not under sentence six but because the ALJ failed to fully and fairly develop the record and thus the Court is unable to determine whether the ALJ's decision is supported by substantial evidence**

Justice argues that, during the April 20, 2012,[16] hearing, his counsel advised the ALJ that recent medical evidence showed that Justice had either ischemic vessel disease or an early onset of a demyelinating condition and his counsel attempted to confirm that the ALJ had received that recent evidence.  Doc. 15, pp. 13-14 (citing Tr. 400-401).  The ALJ concluded that Dr. Siddiqui's opinion was entitled to very little weight because there was no evidence that Justice had suffered a stroke and/or there was no evidence of ischemic disease or demyelinating condition as alleged by Justice's counsel.[17]  Tr. 19, 27-28.   However, Justice claims that the MRI report, which showed abnormalities typically seen with ischemic vessel disease or a demyelinating condition, provide support for Dr. Siddiqui's January 2012 opinion that Justice had severe limitations based in part on findings that Justice had suffered a CVA.  Doc. 15, pp. 13-15.  Thus, he claims that the ALJ either ignored evidence of record and/or, after being alerted to the existence of evidence that could provide support for Justice's claims, failed to fully and fairly develop the record by not taking steps to obtain the medical evidence referenced by Justice's counsel during the April 20, 2012, hearing.  Doc. 15, pp. 13-15.   He seeks remand either on the basis that the MRI results constitute new and material evidence to be considered as part of a sentence six remand under 42 U.S.C. § 405(g) and/or that the ALJ failed to fully and fairly develop the record.

**1.   A sentence six remand is not warranted**

In order to demonstrate an entitlement to a remand under sentence of 42 U.S.C. § 405(g), Justice has to demonstrate that the evidence he now presents in support of a remand is "new" and

---

[16] Justice's brief references an April 20, 2013, hearing date.  Doc. 15, p. 13.  However, the record reflects that the ALJ conducted the second hearing in 2012 and rendered his decision in 2012.  Tr. 12, 398.

[17] In his January 2012 opinion, Dr. Siddiqui reported that Justice had been prescribed a cane and a walker.  Tr. 349.  However, the ALJ also indicated that Dr. Siddiqui's opinion with respect to Justice's physical limitations was entitled to very little weight because there was no evidence Justice required a walker or ambulatory assistive device.  Tr. 27.

"material," and that there was "good cause" for his failure to present this evidence in the prior proceeding.  *See Hollon v. Commissioner*, 447 F.3d 477, 483 (6th Cir. 2006); *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010).  Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding."[18]  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).

Justice contends that he submitted the MRI report through his attorney prior to the April 20, 2012, hearing.[19] Doc. 15, p. 14, n. 5.   Although the MRI report is not in the administrative record, because the MRI report was available to Justice at the time of the administrative proceeding, Justice cannot show that the MRI report is "new" evidence.[20]  Accordingly, Justice is not entitled to a sentence six remand.  However, as discussed more fully below, since the ALJ failed to fully and fairly develop the record, remand is warranted for further development and/or consideration of the evidence.

### 2.  The ALJ failed to fully and fairly develop the record and thus the Court is unable to determine whether the ALJ's decision is supported by substantial evidence

Alternatively, Justice argues that the ALJ failed to fully and fairly develop the record after being alerted to objective medical findings that could support Justice's claim that he had

---

[18] "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Ferguson*, 628 F.3d at 276.  (internal quotations and citations omitted and emphasis supplied) "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.*  (internal quotations and citations omitted and emphasis supplied).

[19] At the April 20, 2012, hearing, the ALJ noted that additional documents (Exhibit B22F) had been submitted on March 22, 2012. Tr. 400.  In his brief, Justice states that the February 14, 2012, MRI results were submitted on April 17, 2012, as opposed to March 22, 2012.  Doc. 15, p. 14, n.5.

[20] Since Justice cannot show that the evidence is "new," It is not necessary for the Court to consider the other two requirements for a sentence six remand.  The Court also notes that the Commissioner's argument in response to Justice's sentence six remand is minimal.  She does not challenge Justice's claim that the evidence is "new" nor does she claim that Justice cannot show "good cause."  She only argues that the MRI results are irrelevant and/or do not prove that Justice had a stroke or that he is disabled.  Doc. 16, p. 2, p. 9. Thus, if her argument addresses any one of the three requirements, it appears to be focused only on whether the MRI results are "material."  Doc. 16, p. 9.

suffered a stroke and/or Dr. Siddiqui's opinion that Justice was status post CVA.  Doc. 15, pp. 14-16.

At the start of the April 20, 2012, hearing, the ALJ responded to an inquiry from Justice's counsel about the exhibits and indicated that B22F included documents submitted on March 22. Tr. 400.  Following that exchange, Justice's counsel proceeded with an opening argument wherein she stated in part,

> And more recently, as you see from B22F, there is evidence that he has <u>either ischemic vessel disease or an early onset of a dymelinating condition</u> that's condition that's consistent with the reports he's made since August of last year of losing balance and his doctor's report of being status post CDA [sic].  We would argue, based on the doctor's RFC's, that he's not able to perform competitive work activity.

Tr. 401 (emphasis supplied).[21]  The ALJ asked some questions relating to documents contained in B22F.  Tr. 401-402.  However, the ALJ did not ask Justice's counsel to specifically identify the evidence she was referring to when making the quoted statement.

With respect to Justice's counsel's argument that there was medical evidence that was consistent with Justice's allegation of loss of balance and his treating physician's opinion that Justice was status post CVA, the ALJ stated in his decision,

> Contrary to the claimant's attorney's representative's argument, the undersigned found no evidence of the purported ischemic vessel disease or demyelinating condition in the new exhibit (Exhibit B22F).

Tr. 19.  With respect to Dr. Siddiqui's opinion, the ALJ stated,

> In December 2012,[22] the claimant's treating physician opined as to severe limitations of the claimant's ability to perform basic work activities, that he requires a cane/walker, and that these were all warranted by the claimant's history of a stroke (B21F).  However, as noted above, <u>there is no objective medical evidence that the claimant suffered from a stroke</u>, nor any objective medical

---

[21] The underlined portion of Justice's counsel's argument was taken nearly verbatim from the MRI report, which is quoted earlier in this Opinion.

[22] Exhibit B21F is dated January 2012, not December 2012.  Tr. 349, 351.

evidence that he requires a walker or ambulatory assistive device.  As such, these opinion is granted very light weight.

\*\*\*

In January 2012, the claimant's primary care physician opined as to the claimant's mental functioning, indicating marked difficulties in withstanding stress, maintaining attention/concentration, and social functioning (B21F p. 3).  <u>This was rendered by the same physician that opined severe physical limitations stemming from a stroke that never actually happened.</u>  As such, the undersigned grants this opinion very little weight.

Tr. 27, 28 (emphasis supplied).  Thus, the ALJ discounted the opinion of Justice's treating physician because of his conclusion that Justice had not had a stroke, a conclusion that Justice contends is contradicted by the MRI results that his counsel alerted the ALJ to during the April 20, 2012, hearing.

"Social security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110–11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) (citing *Richardson v. Perales*, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  An ALJ's duty to develop the record is balanced against the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant."  *Hawkinberry v. Comm'r of Soc. Sec.*, 2011 WL 2555272, \*5 (N.D. Ohio May 24, 2011), *report and recommendation adopted*, 2011 WL 2554243 (June 28, 2011) (quoting *Landsaw v. Sec'y Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)).

Here, Justice was represented by counsel at the hearing.  Thus, the ALJ had no heightened duty.[23]  However, an ALJ does have "an inquisitorial duty to seek clarification on

---

[23] An ALJ's duty may be heightened under special circumstances such as when a claimant is proceeding *pro se*.  *Wilson v. Comm'r Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986) and *Lashley v. Sec'y Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th

material facts." *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010).

Further, "[i]n determining whether it is necessary to remand for clarification of the record, the

Court is guided by whether the record reveals evidentiary gaps which result in unfairness or clear

prejudice." *Hawkinberry*, 2011 WL 2555272, *5 (citing *Brown v. Shalala*, 44 F.3d 931, 935-36

(11th Cir. 1995)).

      In considering whether the ALJ fulfilled his duty to fully and fairly develop the record,

the Court notes that Justice claims that the evidence that the ALJ should have more fully and

fairly developed relates to his treating physician's opinion, which the ALJ made clear was

material to his disability determination.  For example, during the April 20, 2012, hearing, the

ALJ stated, "if I accept the parameters of Dr. Siddiqui's limitations at 21F, page 3, I am going to

conclude that, that would be work preclusive without the need for vocational testimony."  Tr.

408.  Further, at the start of the February 3, 2012, hearing, the ALJ noted that he had specifically

asked Justice's counsel about Dr. Siddiqui's January 2012 opinion and whether there was

documentary support for that opinion (Tr. 371), suggesting that the ALJ recognized correctly that

Dr. Siddiqui was a treating physician and, it was therefore important to determine whether there

was support for his January 2012 opinions.[24]

      Considering the materiality of Dr. Siddiqui's opinion, based on the following testimony,

arguments and/or records, the ALJ should have been prompted to take additional steps to inquire

---

Cir. 1983)) (indicating that special circumstances exist when a claimant is without counsel, not capable of presenting
an effective case, and unfamiliar with hearing procedures ).

[24] As a treating source, Dr. Siddiqui's opinion sits at the top of the hierarchy of medical opinion evidence.  *See
Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2).  His opinion
therefore was entitled to controlling weight so long as the opinion is "'well-supported by medically acceptable
clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence'" of record.
*Wilson*, 378 F.3d at 544.  If an ALJ decides to give a treating source's opinion less than controlling weight, he must
give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight
given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.

further into the medical evidence that Justice argued provided support for Dr. Siddiqui's opinion that Justice was status post CVA.

First, during the February 3, 2012, hearing, Justice testified that he had seen Dr. Hill the day before the hearing because of the possibility of a stroke and Dr. Hill had informed him that he needed to have an MRI done.  Tr. 376-377.   In his decision, the ALJ noted that, during the February 2012 hearing, Justice indicted that he had attended a doctor's appointment the day before the hearing which was related to his alleged stroke.  Tr. 19.  The ALJ does not, however, mention that Justice also indicated that that doctor wanted him to have an MRI.  Tr. 376-377.

Second, during the April 20, 2012, hearing, Justice's counsel argued, referring to Exhibit B22F, "there is evidence that he has either ischemic vessel disease or an early onset of a dymelinating condition that's condition that's consistent with the reports he's made since August of last year of losing balance and his doctor's report of being status post CDA.  We would argue, based on the doctor's RFC's, that he's not able to perform competitive work activity."  Tr. 401. While the MRI report is not in the administrative record, the Commissioner does not challenge Justice's claim that he attempted to submit the MRI results prior to the hearing and/or that, at the time of the hearing, his counsel believed that the ALJ had confirmed receipt of that evidence.[25] Further, although the ALJ asked questions about evidence contained in B22F (Tr. 401-402), the ALJ did not inquire as to what documents in B22F contained the evidence that Justice's counsel was referring to.

---

[25] The Commissioner counters Justice's argument regarding the ALJ's failure to consider the February 14, 2012, MRI results and/or his failure to fully and fairly develop the record by arguing that the February 14, 2012, MRI is meaningless because it fails to mention stroke.  Doc. 16, p. 2, 9.  Additionally, the Commissioner argues that the MRI was performed more than one year ago and there is no supporting evidence that the CVA resulted in atrophy, that the disability lasted more than 12 months, or that Justice required extensive physical, speech, or occupational therapy.  Doc. 16, p. 2, 9.  Thus, the Commissioner asserts that the ALJ correctly determined that a stroke had never occurred.  Doc. 16, p. 2, 9.  The Commissioner's argument would require this Court to interpret and weigh the medical evidence which is not this Court's role.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility").

Third, Exhibit B22F contains treatment notes from Dr. Siddiqui, including March 7, 2012, treatment notes (post-dating the MRI report).  Tr. 353.  Those notes contain the notation "test results," suggesting that test results of some kind were discussed or reviewed during the March 7, 2012, appointment.  Tr. 353.  However, it does not appear that the ALJ inquired about these notes or asked what "test results" were being referred to.[26]

Thus, even though the ALJ acknowledged that, if Dr. Siddiqui's opinion were accepted, the functional limitations contained therein would be work preclusive (Tr. 408), the ALJ failed to inquire further about the evidence that Justice was relying upon at the April 20, 2012, hearing, to support Dr. Siddiqui's opinion.  Rather, the ALJ concluded, without making such an inquiry, that there was no evidence to support either Justice's counsel's argument or Dr. Siddiqui's opinion.[27] Tr. 19, 27, 28.   While the Court recognizes that a claimant bears the burden of producing evidence in support of his claim, in light of the significance placed on treating physician opinions, the record demonstrates that the ALJ should have taken additional steps to inquire further into the medical evidence that Justice argued provided support for Dr. Siddiqui's opinion that Justice was status post CVA.

Moreover, without further development of the record and/or explanation by the ALJ as to what, if any, impact the February 14, 2012, MRI results would have on the weight the ALJ provided to Dr. Siddiqui's opinion, the Court is unable to assess whether the ALJ's decision to

---

[26] The ALJ suggested a lack of independent analysis by Dr. Siddiqui by pointing out that, following Justice's emergency room diagnosis of Bell's Palsy, Dr. Siddiqui's diagnoses included Bell's Palsy and that Dr. Siddiqui did not diagnosis Justice with status post CVA until after Justice reported that other physicians had advised him that he had had a stroke. Tr. 19.  However, the ALJ failed to acknowledge that Dr. Siddiqui's March 7, 2012, treatment notes, i.e., his post-MRI notes, include an assessment of status post CVA but not Bell's Palsy.  Tr. 353.

[27] The ALJ provided only two reasons for discounting Dr. Siddiqui's opinion with respect to Justice's physical impairments, i.e., no objective medical evidence that Justice suffered a stroke and no objective medical evidence that Justice needs an ambulatory assistive device. Tr. 27.  The ALJ provided only one reason for discounting Dr. Siddiqui's opinion with respect to Justice's mental impairments, i.e., those opinions were rendered by the same physician who opined as to physical limitations stemming from a stroke that never happened. Tr. 28.

provide very little weight to Dr. Siddiqui's opinion is supported by substantial evidence. Accordingly, the Court concludes that reversal and remand is warranted for further development of the record, including consideration of the February 14, 2012, MRI results[28] and further medical expert testimony, if deemed necessary, as well as further evaluation the Dr. Siddiqui's January 2012, opinion following the further development of the record.

**B.    Other issues**

Justice also argues that reversal and remand are warranted because the ALJ erred in assessing his RFC and in not adopting the prior ALJ's RFC.  Since further proceedings on remand may impact the ALJ's other findings, the Court declines to address Justice's other arguments.  *See Trent v. Astrue*, 2011 WL 841538, *7 (N.D. Ohio Mar. 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his other findings).

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this Opinion.[29]

Dated:  June 19, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

---

[28] In addition to the February 14, 2012, MRI results, the records that Justice asserts were submitted on April 17, 2012, include EEG test results and blood test results.  Doc. 15-1, pp. 4-6.  Those records would be subject to consideration on remand as well.

[29]  This opinion should not be construed as requiring a determination on remand that Justice is in fact disabled.